UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK

CRAIG BEATTY,

                    Plaintiff,

    v.                                          **DECISION AND ORDER**
                                                06-CV-571S

KATHLEEN DAVIDSON, R.N.,
MICHAEL A. BENSON,
TIMOTHY HOWARD, and
COUNTY OF ERIE, NEW YORK,

                    Defendants.

# I. INTRODUCTION

Plaintiff Craig Beatty commenced this civil rights action under 42 U.S.C. § 1983 on
August 24, 2006, alleging that Defendants denied him adequate medical care while he was
a pretrial detainee at the Erie County Holding Center ("ECHC"), in violation of his
Fourteenth Amendment rights.

Presently before this Court is Defendants' Motion for Summary Judgment.[1] (Docket
No. 70.) For the reasons that follow, Defendants' motion is denied.

# II. BACKGROUND

Because Plaintiff is the nonmoving party, this Court views all facts and inferences
in his favor. Addickes v. S.H. Kress and Co., 398 U.S. 144, 158-59, 90 S. Ct.1598, 1609,
26 L. Ed. 2d 142 (1970).

---

[1] In support of their motion, Defendants filed a memorandum of law, a Rule 56 Statement of
Undisputed Facts, with exhibits, and the reply declaration of Ruthanne Wannop. (Docket Nos. 70-72, 80.)
In opposition, Plaintiff filed a Rule 56 Statement of Facts, with exhibits, the affidavit of Nan L. Haynes, and
a memorandum of law. (Docket Nos. 74-78.)

Plaintiff is a diabetic. (Beatty Tr., Docket No. 75-2, p. 39.) He takes insulin as needed, based on readings of his blood glucose level, which he monitors six times per day. (Beatty Tr., pp. 36-37.) During the time period at issue, Plaintiff took Humalog daily, as needed, usually 30-40 units per day. (Beatty Tr., pp. 37, 50.) He has since also started taking 30 units of Lantus daily, half in the morning, half at night. (Beatty Tr., p. 37.)

## A.      Plaintiff's Arrest — April 14, 2005

Plaintiff is a corrections officer at the Gowanda Correctional Facility. (Beatty Tr., p. 19.) On April 14, 2005, he worked the 6:45 a.m. to 3:00 p.m. shift. (Beatty Tr., pp. 58, 72.) Plaintiff took insulin at approximately 1:00 p.m. that day, after he ate lunch. (Beatty Tr., pp. 60, 73.) He took other medications that day as well, including Lorcet, Valium, Lorazepam, and Prozac. (Beatty Tr., pp. 76-77, 85.)

Plaintiff maintains that he had a reaction to one of his medications or a combination of them after leaving work. (Beatty Tr., p. 78.) He apparently went to a business, had an altercation with the owner, and then went home. (Beatty Tr., pp. 77-79.) He vaguely remembers being arrested by Erie County Sheriff's Deputy George Avery later that evening, around 7:00 p.m. (Beatty Tr., p. 79.) The arrest report, however, indicates that Plaintiff was arrested at 8:00 p.m. (Chase Tr., Docket No. 75-3, p. 20.)

When Avery arrived at Plaintiff's residence, Plaintiff was testing his glucose level and had his insulin on the counter. (Beatty Tr., p. 79.) Avery interrupted Plaintiff's testing and arrested him immediately upon confirming his identity. (Beatty Tr., pp. 79-80.) Plaintiff maintains that he told Avery that he was a Type 1 diabetic, that he had medication with him, that he needed to check his glucose level, and that he needed to take an insulin shot. (Beatty Tr., p. 84.) Avery allegedly told Plaintiff that "they'll do that down at the holding

center." (Beatty Tr., p. 84.)  Plaintiff again reiterated that he needed to take his insulin, and Avery again told him that he would receive medication at the holding center.  (Beatty Tr., p. 84.)  Consequently, Plaintiff left his house without testing his glucose or taking insulin. (Beatty Tr., pp. 79-84.)

Avery first took Plaintiff to the substation, where they completed paperwork.  (Beatty Tr., at 83, 86.)  Plaintiff and Avery were the only people at the substation.  (Beatty Tr., pp. 86-87.)  Plaintiff recalls being there several hours until Avery took him to the ECHC, but he does not recall the drive to the ECHC.  (Beatty Tr., p. 87.)

## B.    Plaintiff's Booking at the Erie County Holding Center — April 14-15, 2005

Erie County Sheriff's Deputy Jeremy Chase booked Plaintiff upon his arrival at the ECHC.  (Chase Tr., pp. 20-21.)  Chase completed a Suicide Prevention Screening form at 11:40 p.m. and booked Plaintiff into the ECHC computer system at 12:30 a.m. on April 15, 2005.  (Chase Tr., p. 21.)  A medical intake form Chase completed indicates that Plaintiff reported that he was diabetic and received insulin shots.  (Chase Tr., p. 27.) Chase testified that he was trained to immediately notify the medical department if an individual identifies himself as diabetic.  (Chase Tr., p. 36.)  But when the medical department is closed, as it was at this time of night,[2] the booking process simply continues. (Chase Tr., p. 36.)

Plaintiff remembers being in the booking area of the ECHC and telling someone that he was a Type 1 diabetic and was in desperate need of insulin.  (Beatty Tr., p. 88.)  He recalls that someone told him that "they don't do that at that area," and that he would have

---

[2]The medical department does not have a third shift; the last shift ends at 11:30 p.m.  (Davidson Aug. 1, 2007 Tr., Docket No. 75-16, pp. 11-12, 25.)

to wait to see medical staff.  (Beatty Tr., p. 88.)

Plaintiff also recalls recognizing Deputy Phil Kuppel, a former co-worker.  (Beatty Tr., p. 110.)  Plaintiff told Kuppel that he was diabetic and needed insulin.  (Beatty Tr., pp. 110; 113-14.)  Kuppel nodded his head, but did not get Plaintiff insulin.  (Beatty Tr., p. 111.)  At that time, Plaintiff was not feeling well, could not think or speak clearly, did not understand why he was being arrested or why he could not have medication.  (Beatty Tr., p. 88.)

After booking, Plaintiff went to a cell for what seemed to him to be hours.  (Beatty Tr., p. 89.)  Plaintiff twice asked a Deputy for medication and reported that he was thirsty and needed something to drink.  (Beatty Tr., p. 89.)  The Deputy told him to drink from the sink in his cell.  (Beatty Tr., p. 89.)  After Plaintiff reported that the sink was inoperable, the Deputy responded that he would try to get Plaintiff a cup of water.  (Beatty Tr., p. 89.)  After a half hour and not having received any water, Plaintiff again asked the Deputy for medication, explained that he was diabetic, and told him he was thirsty and needed water.  (Beatty Tr., pp. 89-90.)

Thereafter, Plaintiff moved to another cell and immediately went to the sink.  (Beatty Tr., pp. 90-91.)  That sink was also inoperable.  (Beatty Tr., p. 91.)  When the Deputy in charge of the cell block came by, Plaintiff again stated that he was diabetic and desperately needed insulin.  (Beatty Tr., p. 91.)  Plaintiff reported that he was becoming dehydrated and was "getting sick."  (Beatty Tr., p. 91.)  The Deputy told Plaintiff that there was nothing that he could do about it and that he would be moved in the morning.  (Beatty Tr., p. 91.)  Plaintiff, desperate for water, cupped his hands and drank out of the toilet in his cell to quench his thirst.  (Beatty Tr., p. 92.)  Plaintiff continued to feel dizzy, delusional,

and dehydrated.  (Beatty Tr., p. 92.)

## C.     Plaintiff's Medical Care — April 15, 2005

Plaintiff did not receive medical care until the next afternoon, on April 15, 2005. According to Angela Gibbs, the Senior Medical Secretary at the ECHC, no procedure exists for an inmate who comes into ECHC between 11:30 p.m. and 8:00 a.m. to be examined for medical problems.  (Gibbs Tr., Docket No. 75-15, pp. 9, 19.)  There is no medical secretary on the second or third shifts.  (Gibbs Tr., pp. 17-18.)  The booking papers go into the "Medical Department" box to be processed in the morning.  (Gibbs Tr., pp. 19-20.) Nurses collect the medical forms and screen them as needed throughout the day until approximately 9:30 p.m.  (Gibbs Tr., p. 20.)  Forms placed in the box after 9:30 p.m. are collected and reviewed the next morning.  (Gibbs Tr., pp. 19-21.)

Gibbs reviewed Plaintiff's booking papers on April 15, 2005, at 9:41 a.m.  (Gibbs Tr., pp. 22-23.)  She did not interview Plaintiff nor did she ever see him.  (Gibbs Tr., p. 23.) After reviewing the booking papers, Gibbs noted that Plaintiff was a diabetic on insulin and delivered the paperwork to the nursing station.  (Gibbs Tr., pp. 24-25.)  Gibbs estimates that the nurses in the medical department would have received Plaintiff's paperwork between 10:00 and 10:30 a.m.  (Gibbs Tr., p. 28.)  But it was not until approximately 2:00 p.m. that day that the medical department requested that the booking department send Plaintiff "to medical," because he was a diabetic.  (Gibbs Tr., p. 27.)

Kathleen Davidson, a nurse at ECHC, saw Plaintiff in the medical department between 2:00 and 2:15 p.m.  (Davidson Aug. 1, 2007 Tr., Docket No. 75-16, pp. 21, 51; Davidson Jan. 30, 2008 Tr., Docket No. 75-18, p. 11.)  Plaintiff told Davidson that he had not had insulin since the previous afternoon and had not eaten that day.  (Davidson Aug.

5

1, 2007 Tr., p. 57.) Davidson determined from the booking papers that Plaintiff was an insulin-dependent diabetic, but she did not start an insulin administration sheet for him, nor did she order him a diabetic diet. (Davidson Aug. 1, 2007 Tr., p. 29; Davidson Jan. 30, 2008 Tr., pp. 11-13.) Davidson determined that Plaintiff's blood glucose level was 368 and that he needed insulin.[3] (Davidson Aug. 1, 2007 Tr., p. 58; Davidson Jan. 30, 2008 Tr., p. 12.) She took a finger stick and called the doctor, because Plaintiff was scheduled to go to court and needed to be taken care of immediately. (Davidson Aug. 1, 2007 Tr., pp. 35-37; Davidson Jan. 30, 2008 Tr., pp. 13, 17.) Davidson gave Plaintiff water and, at a doctor's direction, administered Plaintiff eight units of Humalog. (Davidson Aug. 1, 2007 Tr., pp. 60-61, 64; Davidson Jan. 30, 2008 Tr., pp. 15, 19, 22, 23.) Plaintiff did not receive any food at that time. (Davidson Aug. 1, 2007 Tr., p. 97.) Davidson also ordered that Plaintiff be seen at 10:00 p.m. that night for a blood glucose check and be seen at 8:00 a.m. and 3:00 p.m. for blood sugar testing each of the next four days. (Davidson Aug. 1, 2007 Tr., p. 40; Davidson Jan. 30, 2008 Tr., p. 17.)

**D.    Town Court — April 15, 2005**

At approximately 6:30 p.m., Erie County Sheriff's Deputy Michael Beyers took Plaintiff from the ECHC to Elma Town Court. (Beyers Tr., Docket No. 75-20, p. 16.) They arrived at approximately 6:50 p.m. (Beyers Tr., p. 25.) The court arraigned Plaintiff and noted that he seemed disoriented and said he needed insulin, Valium, and pain medication. (Beyers Tr., p. 35.) According to Beyers, he returned Plaintiff to the booking department at ECHC at 8:00 p.m. (Beyers Tr., pp. 16, 26, 32.)    Beyers does not know

---

[3]The normal range is 80 to 120 or 70 to 100. (Davidson Aug. 1, 2007 Tr., p. 58.)

where within the ECHC Plaintiff was housed after he returned from court. (Beyers Tr., p. 38.)

Despite Plaintiff's return to the ECHC at 8:00 p.m., he missed the 10:00 p.m. finger stick that Davidson ordered. (Davidson Aug. 1, 2007 Tr., p. 65.) This is because the medical department mistakenly believed that Plaintiff had not yet returned from court.

Nurse Laura Cudzilo was working in the medical department that evening and noted from Plaintiff's file that he was insulin-dependent. (Cudzilo Tr., Docket No. 75-19, p. 20.) After Plaintiff missed his 10:00 finger stick, Cudzilo was in contact with a Deputy around 10:30 p.m. (Cudzilo Tr., p. 12.) The Deputy advised Cudzilo that Plaintiff was still out at court. (Cudzilo Tr., p. 12.) The next time anyone from the medical department saw Plaintiff was when Davidson responded to an emergency medical call the next day. (Davidson Aug. 1, 2007 Tr., p. 82.)

## E. Plaintiff's Medical Emergency — April 16, 2005

At approximately 2:30 p.m. on April 16, 2005, Davidson responded to a medical emergency call from the cell-block. (Davidson Aug. 1, 2007 Tr., p. 82.) The call was made because Plaintiff was found lying unresponsive on the floor of his cell. (Davidson Aug. 1, 2007 Tr., p. 82.) When Davidson arrived, she observed Plaintiff slumped over on his bed mumbling. (Davidson Aug. 1, 2007 Tr., pp. 84, 85.) A deputy reported that Plaintiff had been falling into the walls. (Davidson Aug. 1, 2007 Tr., pp. 84, 85.)

Davidson recognized Plaintiff from the day before, knew that he was an insulin-dependent diabetic, and therefore called for a wheel chair. (Davidson Aug. 1, 2007 Tr., p. 84.) Davidson took Plaintiff to the medical department to do a finger stick and call the doctor. (Davidson Aug. 1, 2007 Tr., p. 84.) Plaintiff recorded a high finger stick reading.

(Davidson Aug. 1, 2007 Tr., p. 86.)  Davidson called Dr. Moscati, who told her to give Plaintiff ten units of insulin and transport him to the emergency room.  (Davidson Aug. 1, 2007 Tr., p. 87.)  Plaintiff left by ambulance for the emergency room at approximately 3:15 p.m.  (Davidson Aug. 1, 2007 Tr., p. 23, 87.)  After Plaintiff left, Davidson ordered a 10:00 p.m. finger stick for that night and one for 8:00 a.m. the next morning, in case Plaintiff was not admitted to the hospital.  (Davidson Aug. 1, 2007 Tr., pp. 87-88.)

Plaintiff arrived at the Erie County Medical Center at 4:00 p.m. with a blood glucose level of approximately 795 mg/dl and an acidotic reading of 6.94.  (Mir Tr., pp. 9, 17, 19-20.)  Plaintiff saw the medical intern for the intensive care unit, Dr. Muhammad Mir, at 7:29 p.m.  (Mir Tr., pp. 7, 8.)  Dr. Mir found Plaintiff to be unresponsive, dehydrated, and hypothermic, with a body temperature of 94 degrees.  (Mir Tr., pp. 30, 31.)  Dr. Mir diagnosed Plaintiff with "diabetic ketoacidosis." (Mir Tr., p. 27.)  Plaintiff spent four days in the hospital, returning to the ECHC on April 20, 2005.  (Beatty Tr., p. 95.)

## III.  DISCUSSION

### A.    Summary Judgment Standard

Summary judgment is appropriate if "the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(c).  A fact is "material" if it "might affect the outcome of the suit under the governing law." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986).  An issue of material fact is "genuine" if "the evidence is such that a reasonable jury

could return a verdict for the nonmoving party." Id.

In deciding a motion for summary judgment, the evidence and the inferences drawn from the evidence must be "viewed in the light most favorable to the party opposing the motion." Addickes, 398 U.S. at 158-59. "Only when reasonable minds could not differ as to the import of evidence is summary judgment proper." Bryant v. Maffucci, 923 F.2d 979, 982 (2d Cir. 1991). The function of the court is not "to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." Anderson, 477 U.S. at 249. "Assessments of credibility and choices between conflicting versions of the events are matters for the jury, not for the court on summary judgment." Rule v. Brine, Inc., 85 F.3d 1002, 1011 (2d Cir. 1996).

**B.      42 U.S.C. § 1983**

Civil liability is imposed under 42 U.S.C. § 1983 only upon persons who, acting under color of state law, deprive an individual of rights, privileges, or immunities secured by the Constitution and laws. See 42 U.S.C. § 1983. On its own, § 1983 does not provide a source of substantive rights, but rather, a method for vindicating federal rights conferred elsewhere in the federal statutes and Constitution. See Graham v. Connor, 490 U.S. 386, 393-94,109 S.Ct. 1865, 1870, 104 L.Ed.2d 443 (1989) (quoting Baker v. McCollan, 443 U.S. 137, 145 n.3, 99 S.Ct. 2689, 2695, 61 L.Ed.2d 433 (1979)). Accordingly, as a threshold matter in reviewing claims brought pursuant to § 1983, it is necessary to precisely identify the constitutional violations alleged. See Baker, 443 U.S. at 140. Here, Plaintiff's denial of adequate medical care claims are grounded in the Fourteenth Amendment.

**C.** **Fourteenth Amendment Claim: Denial of Adequate Medical Care**

**1.** **Personal Liability: Defendant Davidson**

A pre-trial detainee's constitutional right to be free from cruel and unusual punishment in the form of inadequate medical care derives from the Due Process Clause of the Fourteenth Amendment, not the Eighth Amendment, which is the source of the same right for convicted prisoners. Thomas v. Nassau County Corr. Ctr., 288 F. Supp. 2d 333, 337 (E.D.N.Y. 2003). Eighth Amendment analysis, however, applies to both claims. See Weyant v. Okst, 101 F.3d 845, 856 (2d Cir. 1996).

The Eighth Amendment, which applies to the States through the Fourteenth Amendment, "prohibits the infliction of 'cruel and unusual punishments' on those convicted of crimes." Wilson v. Seiter, 501 U.S. 294, 297, 111 S.Ct. 2321, 2323, 115 L.Ed.2d 271 (1991); U.S. Const. amend. VIII. As such, prison conditions and the treatment prisoners receive while incarcerated are subject to scrutiny under the Eighth Amendment. See DeShaney v. Winnebago County Dept. of Social Svcs., 489 U.S. 189, 199-200, 109 S.Ct. 998, 1005-1006, 103 L.Ed.2d 249 (1989). In addition, the Supreme Court has recognized that a prisoner's claim that he was intentionally denied medical treatment is cognizable under the Eighth Amendment and § 1983:

> We therefore conclude that deliberate indifference to serious medical needs of prisoners constitutes the unnecessary and wanton infliction of pain proscribed by the Eighth Amendment. This is true whether the indifference is manifested by prison doctors in their response to the prisoner's needs or by prison guards in intentionally denying or delaying access to medical care or intentionally interfering with the treatment once prescribed. Regardless of how evidenced, deliberate indifference to a prisoner's serious illness or injury states a cause of action under § 1983.

. . .

> In order to state a cognizable claim, a prisoner must allege acts or omissions sufficiently harmful to evidence deliberate indifference to serious medical needs. It is only such indifference that can offend evolving standards of decency in violation of the Eighth Amendment.

Estelle v. Gamble, 429 U.S. 97, 104, 106, 97 S.Ct. 285, 291, 292, 50 L.Ed.2d 25 (1976)(quotations and citations omitted).

"A claim of cruel and unusual punishment in violation of the Eighth Amendment has two components – one subjective, focusing on the defendant's motive for his conduct, and the other objective, focusing on the conduct's effect." Sims v. Artuz, 230 F.3d 14, 20 (2d Cir. 2000) (citing Hudson v. McMillian, 503 U.S. 1, 7-8, 112 S.Ct. 995, 999, 117 L.Ed.2d 156 (1992); Blyden v. Mancusi, 186 F.3d 252, 262 (2d Cir. 1999)). With respect to a claim of deliberate indifference to a serious medical need, a prisoner must show that he suffered from a "sufficiently serious" medical condition, see Chance v. Armstrong, 143 F.3d 698, 702 (2d Cir. 1998), and that the defendants acted with a "sufficiently culpable state of mind," Hathaway v. Coughlin, 37 F.3d 63, 66 (2d Cir. 1994).

The subjective component "requires a showing that the defendant "had the necessary level of culpability, shown by actions characterized by 'wantonness' in light of the particular circumstances surrounding the challenged conduct." Sims, 230 F.3d at 21 (citations omitted). The objective component is "contextual and responsive to contemporary standards of decency." Id. (quoting Hudson, 503 U.S. at 8).

> "An official acts with the requisite deliberate indifference when he 'knows of and disregards an excessive risk to inmate health or safety; the official must be both aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference.'"

<u>Brown v. Picarelli</u>, No. 96 Civ. 1222, 2003 WL 1906180, at *6 (S.D.N.Y. Apr. 15, 2003)(quoting <u>Farmer</u>, 511 U.S. at 837).

### a. Serious medical need

The objective element of the test requires a showing that Plaintiff's medical need was "sufficiently serious." <u>Farmer v. Brennan</u>, 511 U.S. 825, 834, 114 S.Ct. 1970, 128 L.Ed.2d 811 (1994). A medical need is "serious" if "the failure to treat a prisoner's condition could result in further significant injury or the unnecessary and wanton infliction of pain." <u>Harrison v. Barkley</u>, 219 F.3d 132, 136–37 (2d Cir. 2000) (quoting <u>Chance v. Armstrong</u>, 143 F.3d 698, 702 (2d Cir. 1998)). <u>Chance</u> sets forth several factors relevant to this inquiry, including whether the plaintiff has "an injury that a reasonable doctor or patient would find important and worthy of comment or treatment; the presence of a medical condition that significantly affects an individual's daily activities; or the existence of chronic and substantial pain." 143 F.3d at 702.

This Court need not linger on this point: diabetes is a sufficiently serious medical condition to meet the objective prong.[4] <u>See</u> <u>Butler v. Smith</u>, 07-CV-00431, 2008 WL 4186338, at *4 n.6 (N.D.N.Y. Sept. 10, 2008); <u>Shabazz v. Lee</u>, 03-CV-1520, 2007 WL 119429, at *6 (N.D.N.Y. Jan. 10, 2007); <u>Johnson v. Harris</u>, 479 F. Supp. 333, 337 (S.D.N.Y. 1979); <u>see</u> <u>also</u> <u>Nance v. Kelly</u>, 912 F.3d 605, 607 (2d Cir. 1990) (Pratt, J., dissenting) (recognizing that diabetes is a serious medical condition).

---

[4]Indeed, Defendants' argument on this point is only that "[t]he failure to administer insulin for this period of time is *arguably* not a serious medical condition." (Defendants' Memorandum of Law, Docket No. 72, p. 8 (emphasis added).)

### b.     Deliberate Indifference

The subjective prong of the Eighth Amendment test requires Plaintiff to show that prison officials acted with "deliberate indifference" to his needs.  Mere negligence in diagnosing or treating a medical condition is not actionable.  <u>Wright v. Conway</u>, 584 F. Supp. 2d 604, 607 (W.D.N.Y. 2008).  Deliberate indifference requires that officials act "with a sufficiently culpable state of mind[]" that is "more than negligence, but less than conduct undertaken for the very purpose of causing harm."  <u>Hathaway v. Coughlin</u>, 37 F.3d 63, 66 (2d Cir. 1994).  This state of mind equates to recklessness as it is referred to in the criminal context.  <u>Salahuddin v. Goord</u>, 467 F.3d 263, 280 (2d Cir. 2006).  Thus,

> [t]his mental state requires that the charged official act or fail to act while actually aware of a substantial risk that serious inmate harm will result. Although less blameworthy than harmful action taken intentionally and knowingly, action taken with reckless indifference is no less actionable.  The reckless official need not desire to cause such harm or be aware that such harm will surely or almost certainly result.  Rather, proof of awareness of a substantial risk of the harm suffices.

<u>Id.</u> (internal citations omitted).

But because the deliberate indifference prong is subjective, "it remains open to the officials to prove that they were unaware even of an obvious risk to inmate health or safety."  <u>Farmer</u>, 511 U.S. at 844; <u>see also</u> <u>Salahuddin</u>, 467 F.3d at 281 (noting that subjective belief that conduct poses no risk, even if unsound, is not deliberate indifference so long as it is sincere).  A trier of fact may, but is not required to, infer knowledge even when the risk is obvious.  <u>Id.</u>  Finally, if officials subjectively knew of a risk, they cannot be liable if they acted reasonably to avert the risk, even if they were ultimately unsuccessful. <u>Id.</u>

After extensive review of the record, this Court finds that a reasonable jury viewing

the evidence could conclude that Davidson acted with deliberate indifference to Plaintiff's serious medical needs.

According to Gibbs, Plaintiff's medical forms indicating that he was an insulin-dependent diabetic would have been delivered to the medical department between 10:00 and 10:30 a.m. (Gibbs Tr., p. 28.) Yet Davidson did not review Plaintiff's paperwork until 2:00 p.m. (Gibbs Tr., p. 27; Davidson Aug. 1, 2007 Tr., pp. 21, 51.)

By the time Plaintiff saw Davidson at 2:00 p.m. on April 15, 2005, he had been without insulin for 24 hours, had spent the night requesting insulin, had been so thirsty that he drank from a toilet, and had complained of feeling sick and dehydrated. (Beatty Tr., pp. 88-114.) The fact that Plaintiff has no recollection of April 15, 2005, at all — including going to the medical department, seeing Davidson, and going to court — suggests that Plaintiff's medical condition had greatly deteriorated by the time he saw Davidson. (Beatty Tr., p. 93.)

Yet Davidson concedes that she did not follow the policies and procedures that govern treatment of insulin-dependent diabetics. (Davidson January 28, 2008 Tr., pp. 16-17.) For example, she did not start an insulin administration sheet nor did she order Plaintiff a diabetic diet. (Davidson January 28, 2008 Tr., pp.16-17.) She also did not give Plaintiff any food. (Davidson Aug. 1, 2007 Tr., p. 97.)

Moreover, although Davidson testified that she administered Plaintiff insulin, there is an issue of fact in this regard. (Davidson Aug. 1, 2007 Tr., pp. 60-61, 64; Davidson Jan. 30, 2008 Tr., pp. 15, 19, 22, 23.) Cudzilo testified that the medical documentation reflects that Plaintiff first received insulin on April 21, 2005, not April 15, 2005, as Davidson testified. (Cudzilo Tr., pp. 29-34.) This is a material and significant factual discrepancy

14

precluding summary judgment.

Finally, although Davidson may have administered Plaintiff insulin and ordered further testing for 10:00 p.m., she did so knowing that Plaintiff was going to court, knowing that there were no continuity of care safeguards in place, and knowing that there was no medical care available at the ECHC overnight, in the event that Plaintiff was not seen at 10:00 p.m., as scheduled.

Thus, this Court finds that a reasonable jury could find that Davidson was deliberately indifferent to Plaintiff's serious medical condition, particularly if it credits Cudzilo's testimony that the medical records do not support Davidson's assertion that she administered insulin to Plaintiff on April 15, 2005.

### c.    Qualified Immunity

The doctrine of qualified immunity protects government officials from liability for damages only if their actions violated no "clearly established constitutional rights of which a reasonable person would have known."  Allah v. Goord, 405 F. Supp. 2d 265, 272 (S.D.N.Y. 2005) (quoting Velez v. Levy, 401 F.3d 75, 100 (2d Cir. 2005)).  There is no question that adequate medical care is a "clearly established" constitutional right.  Estelle v. Gamble, 429 U.S. 97, 97 S.Ct. 285, 50 L.Ed.2d 251 (1976).  Thus, if Plaintiff establishes that Davidson violated his constitutional right to adequate medical care, Davidson is not entitled to qualified immunity.  Moreover, given the unresolved issues of material fact, this Court cannot conclude that it was objectively reasonable for Davidson to believe that her conduct did not violate any of Plaintiff's rights.  Davidson is therefore not entitled to the protections of qualified immunity.

### 2.    Supervisory Liability:  Defendants Benson and Howard

Defendant Michael Benson was the Chief of Internal Affairs for the Erie County Sheriff's Department and was assigned to oversee the ECHC.  (Benson Tr., Docket No. 75-4, p. 14.)  Defendant Timothy Howard was the Undersheriff and head of the Jail Management Division, which included the ECHC.  (Howard Tr., Docket No. 75-6, pp.20-21.)

Defendants argue that Plaintiff's claims against Benson and Howard in their individual capacities should be dismissed because they were not personally involved in the alleged unconstitutional acts.  Plaintiff counters that Benson and Howard were personally involved because they were grossly negligent in training and supervising their subordinates, who allegedly committed the unconstitutional acts.

To recover damages against supervisory officials for the acts of their subordinates, a plaintiff must show that the defendant's personal involvement caused the constitutional deprivation.  Westbrook v. City Univ. of New York, 591 F. Supp. 2d 207, 224 (E.D.N.Y. 2008) (citing Wright v. Smith, 21 F.3d 496, 501 (2d Cir. 1994)); see also Blyden v. Mancusi, 186 F.3d 252, 264 (2d Cir. 1999) (explaining that because section 1983 imposes liability only on officials who cause a constitutional violation, the doctrine of respondeat superior does not apply); Poe v. Leonard, 282 F.3d 123, 140 (2d Cir. 2002) (holding that a plaintiff must show an affirmative causal link between grossly negligent supervision and constitutional violation).

Personal involvement need not be active participation.  It can be found "when an official has actual or constructive notice of unconstitutional practices and demonstrates

gross negligence or deliberate indifference by failing to act." See Meriwether v. Coughlin, 879 F.2d 1037, 1048 (2d Cir. 1989).

Thus, personal involvement can be established by showing that

(1) the defendant participated directly in the alleged constitutional violation; (2) the defendant, after being informed of the violation through a report or appeal, failed to remedy the wrong; (3) the defendant created a policy or custom under which unconstitutional practices occurred, or allowed the continuance of such a policy or custom; (4) the defendant was grossly negligent in supervising subordinates who committed the wrongful acts; or (5) the defendant exhibited deliberated indifference to others' rights by failing to act on information indicating that constitutional acts were occurring.

Liner v. Goord, 582 F. Supp. 2d 431, 433 (W.D.N.Y. 2008) (citing Colon v. Coughlin, 58 F.3d 865, 873 (2d Cir. 1995)); Hayut v. State Univ. of New York, 352 F.3d 733, 753 (2d Cir. 2003).

Plaintiff argues that Benson and Howard were grossly negligent in training and supervising their subordinates, who allegedly deprived him of his constitutional rights. The Second Circuit equates gross negligence with recklessness, defining it as "the 'kind of conduct . . . where [the] defendant has reason to know of facts creating a high degree of risk of physical harm to another and deliberately acts or fails to act in conscious disregard or indifference to that risk.'" Poe, 282 F.3d at 140 n. 14 (quoting Bryant v. Maffucci, 923 F.2d 979, 985 (2d Cir. 1991)). Simple negligence is not enough to establish personal involvement for the purposes of supervisory liability. Davidson v. Cannon, 474 U.S. 344, 347, 106 S.Ct. 668, 88 L.Ed.2d 677 (1986).

To prevail on a claim of supervisory liability, a plaintiff must show some evidence that supervisory officials knew or should have known of a substantial risk that constitutional rights would be violated due to their lack of supervision, that the officials consciously

disregarded the risk by failing adequately to supervise, and that such disregard caused a constitutional violation committed by subordinates.

Here, assuming *arguendo* that subordinates at ECHC violated Plaintiff's constitutional rights, summary judgment as to Benson and Howard is proper only if no reasonable jury could find that their supervision was "grossly negligent." There is no evidence in the record that Benson or Howard had knowledge of Plaintiff's detention at ECHC, or knowledge of his particular condition. Further, Plaintiff has provided no evidence that Benson or Howard knew of any specific prior instances of problems with diabetic inmates that would put them on notice as to inadequacies in the handling of such inmates.

But Benson and Howard were aware that diabetic inmates were housed at ECHC from time to time and they were aware that no medical services were available at the ECHC between 11:30 p.m. and 7:30 a.m. Moreover, both Benson and Howard knew or should have known that diabetes is a serious medical condition requiring monitoring and medication. Yet Chase, Gibbs, and Davidson testified that they did not receive training in diabetes care. (Chase Tr., p. 10; Gibbs Tr., pp. 26, 29, Davidson Aug. 1, 2007 Tr., pp. 9, 11.)

There is also evidence in the record that Benson and Howard were informed, after an evaluation by the Commission on Corrections, that the ECHC lacked a system for monitoring chronically ill inmates. Both Benson and Howard testified that they disagreed with this assessment and they apparently took no action to address it. (Benson Tr., p. 61; Howard Tr., p. 88.)

This Court therefore finds sufficient evidence in the record from which a reasonable jury could conclude that Benson and Howard were "grossly negligent" in supervising their

subordinates and that their negligence resulted in Plaintiff's constitutional injury.  This precludes summary judgment.

### 3.      Municipal Liability: Erie County

Defendants argue that Plaintiff cannot prevail against Erie County on any theory of municipal liability because Plaintiff's constitutional rights were not violated by any policy. Plaintiff argues that the Erie County Legislature, Benson, and Howard showed deliberate indifference sufficient to support a claim against the County.

Section 1983 imposes liability on a municipality that's official custom or policy *causes* an employee to violate an individual's constitutional rights.  Monell v. Dep't of Soc. Servs., 436 U.S. 658, 98 S.Ct. 2018, 56 L.Ed.2d 611 (1978).  Like supervisory liability, municipal liability in the context of § 1983 actions cannot be premised solely on a *respondeat superior* theory, but must be based on constitutional deprivations caused by an officially promulgated, or *de facto*, governmental "custom" or "policy[.]" Pembaur v. City of Cincinnati, 475 U.S. 469, 480, 106 S.Ct. 1292, 1298, 89 L.Ed.2d 452 (1986).

The existence of municipal policy or custom can be demonstrated in several ways, including: (1) showing an officially promulgated and endorsed municipal policy, Monell, 436 U.S. at 658; (2) showing that actions taken by officials with final policymaking authority caused a constitutional violation, Pembaur, 475 U.S. at 480–81; (3) showing that municipal decisionmaking evidences "deliberate indifference" to the rights of those with whom municipal employees come in contact, including failure to remedy an otherwise constitutional policy so deficient that policymakers knew or should have known with a high degree of certainty that constitutional violations could result, City of Oklahoma City v.

Tuttle, 471 U.S. 808, 819, 105 S.Ct. 2427, 85 L.Ed.2d 791 (1985), or failure to train employees when training is necessary to prevent the violation of federal rights, City of Canton v. Harris, 489 U.S. 378, 109 S.Ct. 1197, 103 L.Ed.2d 412 (1989).

Here, this Court finds that there is sufficient evidence from which municipal liability could be found.

First, as a matter of policy, the medical department was closed and unstaffed between the hours of 11:30 p.m. and 7:30 a.m. No medical care was available at the ECHC during that time period. The New York State Commission on Corrections faulted the ECHC in March 2005 for not having a "coordinated system for 24 hours, seven days a week health services program operation." (Commission on Corrections Report, Docket No. 75-8.) Benson was advised of this deficiency in a conference at the end of March 2005, yet nothing was apparently done to address it. (Benson Tr., pp. 59-61.)

Second, evidence in the record suggests that Erie County eliminated medical personnel at the ECHC, leaving the medical department routinely understaffed. (Erie County Legislature Minutes, Docket No. 75-5 and 75-13; Billittier Tr., Docket No. 75-12, pp. 39-40.)

Third, an evaluation of the ECHC between March 28 and April 1, 2005, by the New York State Commission on Corrections noted that the position of Health Services Administrator had been eliminated and that there "was no system for the management and monitoring of chronically ill inmate/patients." (Commission on Corrections Report, Docket No. 75-8, p. 13.) Benson was advised of this deficiency in a conference at the end of March 2005, yet nothing was apparently done to address the Commission's findings. (Benson Tr., pp. 59-61.)

20

Fourth, the ECHC lacked a policy for ensuring adequate care for inmates with diabetes who were brought into the facility when the medical department was closed. (Koch Tr., Docket No. 75-7, pp. 79-80; Billittier Tr., p. 30; Chase Tr., p. 37.) No procedure, for example, was in place to review an inmate's booking papers for indications of medical problems. (Koch Tr., pp. 85-86.)

Finally, despite knowing the risks associated with diabetes and the need to treat inmates with diabetes, the County failed to update its policies or properly train its employees. For example, Chase, Gibbs, and Davidson each testified that they had not been trained in the care and custody of inmates with diabetes. (Chase Tr., p. 10; Gibbs Tr., pp. 26, 29, Davidson Aug. 1, 2007 Tr., pp. 9, 11.)

This Court finds sufficient evidence in the record from which it could be concluded that Erie County lacked a system at the ECHC for managing chronically ill inmates and failed to train and properly supervise its staff, such that it may be subject to municipal liability. Further, there is sufficient evidence in the record suggesting that the County's policies and failures caused the constitutional deprivations that Plaintiff allegedly suffered. Summary judgment is therefore denied.


## IV. CONCLUSION

For the foregoing reasons, Defendants' Motion for Summary Judgment is denied.

## V. ORDERS

IT HEREBY IS ORDERED, that Defendants' Motion for Summary Judgment (Docket No. 70) is DENIED.

FURTHER, that counsel shall appear before this Court on April 15, 2010, at 9:00 a.m for a status conference to discuss how this case will proceed.

SO ORDERED.


Dated:   March 31, 2010
          Buffalo, New York

/s/William M. Skretny
WILLIAM M. SKRETNY
Chief Judge
United States District Court
